IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 14, 2021

## STATE OF TENNESSEE v. TOMMY MICHAEL OWEN

**Appeal from the Circuit Court for Lewis County**
**No. 2019-CR-4     Michael E. Spitzer, Judge**

_____

### No. M2020-01375-CCA-R3-CD

_____

Defendant was convicted by a Lewis County Circuit Court jury of reckless aggravated assault, a Class D felony, and sentenced by the trial court to two years in the Department of Correction, suspended to unsupervised probation. Defendant argues on appeal that the trial court abused its discretion in denying his request for judicial diversion. Based on our review of the entire record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

David Christensen, Franklin, Tennessee, for the appellant, Tommy Michael Owen.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Hunter Knight, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On January 28, 2019, Defendant, Defendant's mother, and the victim, Defendant's stepfather, were involved in a verbal altercation regarding the eviction of Defendant from the property previously owned by Defendant's mother and Defendant's father. During the altercation, Defendant pulled out his pistol and fired a shot that grazed the back of the victim's neck. The Lewis County Grand Jury subsequently returned a three-count indictment charging Defendant with aggravated assault, reckless aggravated assault, and

reckless endangerment with a deadly weapon. At the conclusion of the trial, the jury convicted Defendant of reckless aggravated assault and acquitted him of aggravated assault and reckless endangerment with a deadly weapon.

While it is the duty of the appellant to prepare the record, the trial transcript is not included in the record before this court. The trial court, however, provided an extensive summary of the trial testimony in its sentencing memorandum. According to the trial court's memorandum, the trial testimony revealed that the victim and Defendant had a hostile relationship that originally stemmed from Defendant's mother's extramarital affair with the victim, which apparently began after Defendant's father had been diagnosed with terminal cancer. The victim began coming to the couple's home to help with chores on the rural property. Defendant lived with his wife and son in a separate mobile home located on the same property. Prior to the death of Defendant's father, the victim and Defendant's mother moved in together and became caretakers of Defendant's father until his death. After the death of Defendant's father, Defendant's mother married the victim.

In his brief, Defendant's counsel states that Defendant's father died by suicide while incarcerated at a special needs facility in the Tennessee Department of Correction, having discharged a weapon at his wife's workplace, the Lewis County Courthouse, upon learning of his wife's affair with the victim. Although it may be an accurate rendition of what transpired, it is not included in the trial court's summary of the trial testimony or anywhere else in the record on appeal. According to the trial court's sentencing memorandum, Defendant testified at trial that after his mother abandoned his father, Defendant and Defendant's wife cared for the father until his death.

Regardless of how Defendant's father died, Defendant's mother decided at some point after his death to sell the property. Because Defendant and his wife refused to move, Defendant's mother and the victim filed an eviction action that resulted in a court order for Defendant to vacate the property by February 15, 2019.

On January 28, 2019, Defendant's mother and the victim went to the property to install posts for a gate across the drive. Defendant saw the activity, armed himself with his pistol, and went down the drive to confront his mother and the victim. Testimony at trial differed about what Defendant said, but the parties agreed that Defendant became upset when the victim interjected himself into Defendant's conversation with his mother. There was also conflict in the testimony about whether it was Defendant or the victim who first pulled out a gun. It was undisputed, however, that Defendant fired at the victim and that the bullet grazed the victim across the back of the victim's neck.

At the June 2, 2020, sentencing hearing, the victim testified that he and Defendant's mother were reinstalling gate posts that had been destroyed by a recent tornado when Defendant came down the drive and began "hounding" his mother about needing more time to vacate the property. According to the victim, Defendant kept talking about his new house not being ready by the February 15 deadline. When the victim interrupted Defendant to tell him that he needed a back-up plan, Defendant became enraged and began reaching into his pocket. The victim said he was aware that Defendant routinely carried a pistol. Therefore, when he saw Defendant's movement toward his pocket, he told him that he did not "need to go there." According to the victim, the next thing he knew, Defendant had pulled his pistol out and was holding it in both hands aimed at the victim's face.

The victim testified that he thought he could diffuse the situation by walking away, but when he turned he "got a bullet right across the back of [his] neck." The victim said that he responded by running to the back of his trailer, pulling his own gun out of his pocket, and "fumbling with it." When Defendant followed him, he put the gun back into his pocket without pointing it at Defendant and began wrestling with Defendant for control of Defendant's weapon. The victim stated that his own gun fell out of his pocket during his struggle with Defendant on the hillside.

The victim testified that his relationship with Defendant deteriorated after Defendant's mother asked Defendant to move from the property. Although he had not mentioned it at trial, the victim testified that Defendant had threatened to kill him on two earlier occasions. The victim claimed that his lawyer had advised him to always take his own weapon with him to the property because of those death threats and Defendant's habit of carrying a weapon. The victim expressed his opinion that a sentence of probation or judicial diversion would not be a fair outcome, testifying that his own father, who had no criminal record, "poured gas in [his] mother's house, but he didn't light the match," and was sentenced to serve eight years in prison.

On cross-examination, the victim expressed his belief that the sheriff's department had been aware of Defendant's previous threats to kill him, which occurred at the Hohenwald home of Debbie Devore, a cousin of Defendant's mother. He denied that he had pointed his gun at Defendant, stating that he could not shoot Defendant in front of his mother. According to the victim, the outcome would have been different had Defendant's mother not been present.

Lisa Owen, Defendant's wife, testified that she and Defendant had been married for almost twenty-seven years and had one child, a nineteen-year-old son, who lived with them and attended school. She said she had a number of health problems, including breast cancer, which had first been diagnosed in July 2014. Defendant drove her to her medical

appointments and their son to school, performed all the housework, took care of all yardwork, and assisted her with showering.  She and Defendant each drew disability, with the Defendant's disability dating from before the birth of their son.  She was unsure of the exact nature of his disability other than that he suffered "social phobia and OCD[.]" Defendant for the most part remained at home because he did not like to be out in public.

Mrs. Owen testified that Defendant had not had any contact with his mother or the victim since the incident.  Prior to the incident, Defendant had never been arrested and Mrs. Owen had never before seen him engage in any act of violence.  Defendant had been going to "Centerstone" for mental health treatment since they were first married and was currently on medication for his mental health.  Mrs. Owen testified that she and her son depended on Defendant's help at home because Defendant performed a number of tasks, including assistance with her personal hygiene, that no one else could do.

On cross-examination, Mrs. Owen testified that the victim pulled his gun out first, forcing Defendant to shoot in self-defense.  She insisted that the victim had been facing Defendant when Defendant fired his gun and speculated that he must have turned his head the instant before the bullet struck him.  She stated that the only reason Defendant left their mobile home was to ask his mother if she knew anyone who could help him move his storage buildings.  She said Defendant was in the habit of carrying his gun whenever he left their home.  She acknowledged that neither the victim nor Defendant's mother approached their mobile home.  She further acknowledged that it would have been possible for Defendant to relay a message to his mother through their respective lawyers.  She added, however, that Defendant and his mother were able to hold civil conversations when the victim was not around to instigate conflict.

Defendant testified that he was forty-six-years-old and had obtained his handgun carry permit when he was in his early twenties.  The permit had since been revoked as a result of the instant offense.  He no longer owned any guns, having sold his three guns before trial because he needed the money.  He had dropped out of school in the ninth grade and worked a series of jobs, including his last job with the Tennessee Department of Transportation, before quitting work approximately twenty years earlier due to his mental health problems.  Defendant explained that he suffered from major depression and stress and had started cutting himself, which had motivated him to seek mental health treatment at Centerstone.  He said he currently took medication for OCD, depression, anxiety, and social phobias and was fine as long as he stayed busy with home chores and no one bothered him.  He stated that he had not had any problems with anger issues since he had been placed on his medication.

- 4 -

Defendant described his caretaking of his wife and said that their son would be unable to assume his duties because many of the required tasks were too personal. He said he had not had any contact with the victim or his mother since the incident, did not desire to have a relationship with them, and sought only to live his life quietly and free from drama. Since the incident, his depression had worsened but remained manageable as long as he stayed busy with tasks during the day. He said he would continue with his mental health treatment and would comply with any conditions of probation.

Defendant denied that he threatened the victim's life or that he had gone to Ms. Devore's house after his mother began her affair with the victim. He volunteered, however, that he had heard that the victim and his mother had met at Ms. Devore's house during his father's lifetime to carry on their affair. He testified that he strapped on his gun holster on the day of the incident because it was his habit to carry his gun with him whenever he left his home. In an apparent contradiction to that statement, he agreed that his decision to carry the gun had also been influenced by his knowledge that the victim was frequently armed. He said he wished the incident had never happened and that it could have been avoided had his mother and the victim waited on the gate installation until after he and his family had vacated the property. He insisted he had to go down to see what they were doing because his movers would have been unable to bring his storage sheds out the narrow driveway if the posts were left where the victim and his mother were installing them. He said when the victim kept interrupting his conversation with his mother and he told the victim to "just shut the F up," the victim pulled a gun on him.

On cross-examination, Defendant testified that he was taking medication for his anger issues at the time of the incident. He reiterated that the incident could have been avoided had his mother and the victim waited until he had moved from the property, but he conceded that the incident would not have occurred had he not gone down to see what they were doing. He refused to concede that the incident could have been prevented if he had left his gun at home, testifying that if he had not had his gun with him, he would have been dead. Defendant stated that he reacted to the victim's pulling his gun on him by pulling his own gun and firing a shot at the victim without aiming. When asked why he failed to mention his concern with the placement of the posts during his trial testimony, he responded that he thought he had mentioned it. Defendant refused to acknowledge that he was in any way at fault for the incident. When asked if he would seek to regain his handgun permit or purchase more weapons if he were granted diversion and his record cleared, he replied that he did not know about the carry permit but that he might want to again own guns.

On June 15, 2020, the trial court entered an extensive sentencing memorandum in which it analyzed in detail the seven factors required to be considered and weighed for

judicial diversion as set forth in *State v. Electroplating, Inc*., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). The trial court concluded that Defendant was not a favorable candidate for judicial diversion. The court also concluded, however, that a sentence of probation was suitable under the unusual facts and circumstances of the case, which included the fact that the victim, who was aware of Defendant's mental health issues, engaged in provocative behavior toward Defendant. Accordingly, the court sentenced Defendant as a Range I, standard offender to two years in the Department of Correction, suspended to unsupervised probation.

## ANALYSIS

Defendant contends on appeal that the trial court abused its discretion in denying his request for judicial diversion. Specifically, he argues that the court erred in finding that the circumstances of the offense weighed against diversion, in conflating its analysis of the factor concerning Defendant's physical and mental health with the factor concerning the circumstances of the offense, and in finding that diversion would have no deterrence value to Defendant or others. The State responds that the trial court properly denied the request for judicial diversion because the record supports the court's findings that five of the seven *Electroplating* factors weigh against the granting of diversion. We agree with the State.

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. T.C.A. § 40–35–313(a)(1)(A); *State v. Dycus*, 456 S.W. 3d 918, 925 (Tenn. 2015). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. *Id.* § 40–35–313(a)(2), (b); *Dycus*, 456 S.W.3d at 925.

As an offender convicted of a Class D felony and with no prior criminal record, Defendant met the statutory requirements to be considered for judicial diversion. *See id.* § 40-35-313(a)(1)(B). Mere eligibility, however, does not entitle a defendant to judicial diversion. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Instead, the decision to grant or deny a qualified defendant judicial diversion "is entrusted to the trial court." *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014) (citation omitted). In determining whether to grant diversion, the trial court is to consider the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. *Electroplating,* 990 S.W.2d at 229.

"A trial court's decision to grant or deny judicial diversion is reviewed for an abuse of discretion with a presumption of reasonableness." *King*, 432 S.W.3d at 327. In *King*, our supreme court held that "nothing in *Bise* or its progeny requires the abrogation of the *Parker* and *Electroplating* factors:

> Under the *Bise* standard of review, when the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision. Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*King*, 432 S.W.3d at 327 (footnote omitted).

The record reveals that the trial court considered and weighed each of the *Electroplating* factors in its decision to deny Defendant's request for judicial diversion. The court found that Defendant's amenability to correction and Defendant's criminal history both weighed in favor of diversion, noting that Defendant had no prior criminal record, had had no contact with his mother or the victim since the incident, and expressed his desire to have no contact with them in the future.

The trial court found that the circumstances of the offense weighed heavily against diversion. The court recognized the unusual and provocative set of facts that preceded the incident, with Defendant having been evicted from his childhood home by his mother and the victim, who had been involved together in an extramarital affair while Defendant's father was dying. The court found, however, that the most significant circumstance was that Defendant, who was aware that he suffered from anger management issues, made the decision to arm himself to walk down the drive to confront the victim, a man he despised.

The trial court found that Defendant's social history also weighed heavily against diversion. The court noted the Defendant's history of mental health problems, including anger management issues, and Defendant's testimony that he generally avoids contact with other people. For that reason, the court found that Defendant "was treading on thin ice by

initiating contact with [the victim] and his mother under a volatile situation and doing so with a loaded weapon at the ready."

The trial court found that Defendant's physical and mental health weighed against diversion, noting the evidence about Defendant's mental health issues and observing that Defendant "should be cautious about his encounters and continue to seek therapy for his diagnosis."

The trial court found that the sixth factor, the deterrence value to Defendant and others, weighed against diversion. The court's major concern was Defendant's refusal to accept responsibility for his own actions and his continued attempt to place complete blame on the victim for the incident. Noting that the jury, by its verdict, obviously rejected Defendant's claim of self-defense, the court found that there would be no deterrence value to Defendant if diversion were granted.

Finally, the trial court found that diversion would serve neither the interest of the public nor Defendant. The court, therefore, concluded that Defendant's was not a proper case for judicial diversion.

Defendant cites the trial court's application of the mitigating factors that Defendant acted under strong provocation and committed the offense under such unusual circumstances that it was unlikely a sustained intent to violate the law motivated his conduct, *see* T.C.A. § 40-35-113 (2), (11), in support of his contention that the trial court abused its discretion in finding that the circumstances of the offense weighed heavily against the granting of judicial diversion. The trial court's finding of applicable mitigating factors, however, was separate from its analysis of the *Electroplating* factors. In its analysis of whether the circumstances of the offense weighed in favor of or against the granting of judicial diversion, the trial court recognized the unusual and provocative circumstances that preceded the offense. The court nevertheless found that the most significant circumstance, which weighed heavily against diversion, was Defendant's decision against that acrimonious background to arm himself with his weapon to go down to confront the victim, a man he despised. The trial court's finding that the circumstances of the offense weighed heavily against the granting of diversion is fully supported by the record.

Defendant also contends that the trial court abused its discretion by conflating the factor of Defendant's mental health with the circumstances of the offense and by finding that Defendant's "decision to receive mental health treatment and spend the majority of his time with his intact nuclear family to weigh against diversion."

We respectfully disagree with Defendant's characterization of the trial court's findings. When read in context, it is clear that the trial court's finding that Defendant's social history and mental health weighed against the granting of diversion was not based on the fact that Defendant sought mental health treatment and chose to spend most of his time at home with his nuclear family, but instead on the fact that Defendant, knowing of his mental health issues and difficulty with social encounters, made the conscious decision to arm himself before initiating a confrontation with the victim.

Finally, Defendant contends that the trial court abused its discretion by finding that there would be no deterrence value to a sentence of judicial diversion and by relying too heavily in its decision on its concern about Defendant's future ownership of firearms. Defendant argues that the trial court erred by counting the Defendant's consistent account that he acted in self-defense against him and asserts that the "idiosyncratic circumstances of the offense" suggest that "the deterrent value in denying diversion is extremely low."

We, again, respectfully disagree. In finding that the deterrence factor weighed against the granting of diversion, the trial court properly noted the Defendant's adamant refusal to accept any responsibility for his role in the incident, along with his testimony at the hearing that he would probably get another gun if he were granted diversion and his record expunged. The trial court's findings are supported by the record.

We, therefore, conclude that the trial court acted within its discretion in denying Defendant's request for judicial diversion. Accordingly, we affirm the judgment of the trial court.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JILL BARTEE AYERS, JUDGE